CHICAGO CITY RY. CO. v. CITY OF CHICAGO. ECKELS et al. v. SAME. In re UNIVERSAL TRANSFERS.

(Circuit Court, N. D. Illinois, N. D. February 16, 1905.)

Nos. 27,595, 27,596.

1. STREET RAILROADS—TRANSFER OF FRANCHISE—LEGISLATIVE RECOGNITION.
    The effect of the incorporation in 1861 of the West Division Railway Company to take over, so far as related to the West Side in Chicago, the rights of the South Side Railroad Company, which held a franchise to operate street railroads on both the South and West Sides, together with the act of 1865 ratifying all transfers of rights between the two companies and the subsequent action of the city council since that time

In dealing with the two separately, was, at least prima facie, to entirely segregate the companies and to divest the South Side Company of all rights and incidental obligations on the West Side.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Street Railroads, §§ 123, 124.]

2. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—ORDINANCE PROVIDING FOR UNIVERSAL TRANSFERS ON STREET RAILROADS.

A city ordinance requiring a street railroad company to accept trans·fers issued to passengers by other companies, in no way connected with it, and to carry such passengers over its lines without charge, is unconstitutional and void as depriving such company of its property without due process of law; and it is immaterial that the requirement is reciprocal and that in operation the effect of the ordinance might be to increase business to such an extent that the companies would suffer no loss.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Constitutional Law, §§ 762–847.]

3. COURTS—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A suit to enjoin the enforcement of an ordinance requiring a street railroad company to carry without pay passengers holding transfers from other car lines is cognizable in equity on the ground of preventing a multiplicity of suits and is within the jurisdiction of a federal court, where the invalidity of the ordinance is alleged on the ground that it deprives the company of its property without due process of law in violation of the federal Constitution.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, § 823.]

In Equity. In the matter of the universal transfers. On petition for preliminary injunction.

John P. Wilson, E. R. Bliss, and John J. Herrick, for complainant city railway company.

John S. Miller and W. W. Gurley, for complainant Eckels and others.

Edgar B. Tolman, Wm. H. Sexton, James Hamilton Lewis, Wm. D. Barge, Edwin Burritt Smith, and Harry P. Weber, for defendant.

GROSSCUP, Circuit Judge (orally). I think that for the purposes of the application for temporary injunction, that there need be no further discussion. If this were the case of a public service corporation that had assigned or attempted to assign its franchises and its undertakings to another company without the consent of the power that gave it the franchise, or for whose use the franchise was to be exercised, and this ordinance were passed to hold the two companies to a regulation of the rates as if such attempt had not been made, or having been made was recognized as not being the outgrowth or creation of the municipality or state itself, it might be easily sustained under the decision of the Supreme Court of the state, assuming that decision to be the law that would be applicable to the rights of the parties in such case. But this is not that kind of a case.

Originally the South Side Railroad Company was given a franchise to operate on the West Side as well as the South Side. In accepting that franchise it undertook certain obligations and duties to the public. In a little while, for some reason that need not now be recalled, the South Side Company was ready to abandon the benefits, and to be relieved of the undertaking, so far as the West Side was concerned.

The Act of 1861, incorporating the West Division Railway Company, and the Act of 1865, relating to what took place between the companies, clearly manifest to my mind such a purpose upon the South Side Company, a purpose on the part of the West Side Company to take up what the South Side Company was relieved from, and a purpose upon the part of the people of Illinois, through the Legislature, to permit that to be done—to ratify it, to make it a part of the conduct of the State with respect to these two companies. There can be no other construction put upon those two Acts—to carry out the letter and spirit of those two Acts.

The Act of 1865 ratifies "all acts or deeds of transfer of rights, privileges or franchises between the corporations in said several acts named, or any two of them, and all contracts, stipulations, licenses and undertakings made, entered into or given, and as made or amended by and between the said common council and any one or more of the said corporations respecting the location, use or exclusion of railways, in or upon the streets, or any of them," to be held in force during the life of the Act. I cannot see how, after that Act was passed, and the parties had all acted upon it, its effect was not to completely wipe the slate, at least so far as the public was concerned, of the South Side's rights, and of course, coincidently, of its undertakings on the West Side. Evidently the purpose of the Act was to place these companies, with reference to themselves and to the public, as if, instead of having been organized as a single company for the South and West Sides, they were organized as two companies, one for the South Side, and one for the West Side.

From that time on to this the Council has dealt with the West Side without any reference at all to the South Side—as if it were an absolutely independent company. I know of no instance in which the South Side was thought to have even an equity of any kind in the West Side Company. So that I must look—at least upon this application for a temporary injunction, a hearing in its nature more or less cursory and not subject to the minutest argument—on this legislation and these ordinances as a segregation, upon the part of the State—as the expression of the State's deliberate purpose—of these two portions of the City for street railway purposes, one of which thereafter should be operated by the West Side Company and one of which thereafter should be operated by the South Side Company, neither having any remnant of right left over upon the other, and reciprocally neither having any obligation left over on the other.

That brings me to the question of what is the right of these companies, as if they had from the beginning been independent companies. I do not think it is necessary to go into the question at the present time of whether these legislative acts and the ordinances create a contract right of a five cent fare, that the City may not in the pursuit of reasonable regulations modify or change. The case presented, perhaps, is as strong as the Detroit case, or as strong as the Cleveland case, but, as suggested by the Corporation Counsel in argument, this is a case under the laws of Illinois, and not under the laws of Michigan and Ohio, and possibly an interpretation of the

Illinois law would leave without the finality of a contract that which, under the laws of Michigan and Ohio, would make a final contract. If this application for an injunction turned on that question, I would not be willing to say that there was no contract. I simply pass it as not being essential to the determination of the motion. I think this motion will have to be sustained upon the due process clause of the Constitution, and that being sufficient the other can be for the time laid aside.

It is said, and said truly, that even under the due process clause of the Constitution a city may exercise all its constitutional rights of regulation, and unless the exercise of those rights deprives a party of a property right, it can not be made the basis of an application such as this. Let us see what the City's right is in that respect. I assume now again that the Supreme Court of the State is right, that the City of Chicago, under these several Acts upon which that decision of the Supreme Court was predicated, has the right of a reasonable regulation; that that right inheres in the contract between the companies and the City, whether that contract is evidenced by the Acts of the Legislature, or whether it is evidenced by the ordinances of the City Council. The whole doctrine, when reduced to its last word, is this: That the particular company which has accepted its charter from the State and City with this reservation upon the part of the City to reasonably regulate its fares shall be subject to the exercise of that regulation; that that particular company, with respect to the property that it has obtained under the contract, when it accepts that contract from the City with the reservation of the right to regulate, must subject the management of its property to the exercise of that regulation.

Now, is that all that this ordinance proposes to do with respect to the property of the South Side Company? The ordinance, if applied —whether in its restricted sense or in its larger sense, taking any passengers who may come from all points over the lines mentioned— is an ordinance that seeks to compel the South Side Company to transport for nothing a man who may happen to have ridden over the lines of another independent company. True it is said that the general outcome of that ordinance will not injure the South Side Company because the transfer of passengers in this way will stimulate new business so that it will get just as many or more nickels than it would have gotten before, and that ordinarily if it carry a passenger into its territory for nothing the passenger will have to pay a nickel to get out of their territory; that street railway traffic is usually not simply a one-way traffic, but is a traffic to and from—from which it might be inferred that at most the effect of this ordinance would be to reduce the fare to one-half, each of these companies getting $2\frac{1}{2}$ instead of 5 cents for the transportation; and that such regulation might be within the power of the City to enforce, in the absence of proof that it would be unreasonable. But that is not the case.

The enjoyment of property is not simply the right to have the property as valuable as it was before, especially if the judgment as to that value would be exercised by somebody else. The right to

enjoy property is the right to not simply obtain all the increment it brings with it. I cannot be said to enjoy my property if some one else, a stranger to me in that respect, can compel me to enjoy it in any way but his way; although he be beneficent enough to say, and to prove, that such exercise of it will not hurt me financially. It does hurt me in my rights as a property owner. It does hurt me in the enjoyment of my property. He may not compel me to go into a co-partnership with somebody whom I don't care to go into a co-partnership with. He may not compel me to link up my business with strangers. Strangers may or may not honestly observe reciprocal relations. The enjoyment of property meant by the 14th Amendment is that full exercise of dominion over one's own property—over that which one has himself created—that the whole law of property, from ancient times down to the present time, gives to a man, subject only to the paramount rights of the State. And if the State has any paramount interest it must exercise it under the other provisions in the Constitution and in the way pointed out. The City and State may take property either for the purpose of operating it itself, or for the purpose of linking it up with some larger corporation, and allowing the larger corporation to operate it on the one-transfer and one-fare principle, but the State cannot compel either one of these companies to do that. The State can take it by paying for it. But it cannot compel these companies to enter involuntarily into a co-partnership such as that. To do that is to take one of its rights of enjoyment of property without due process of law. If the City can do that, it can put forward its advances step by step, until there is no property right left at all; until the State would have control of everything; and upon the mere defense that it was doing no injury—that in the end one got more, or as much of it as he was getting before—would take away the dominion entirely. Dominion is enjoyment, and dominion is a part of the property right that the 14th Amendment was intended to protect.

The only other question left in this case is whether this Court has jurisdiction. If these parties were left to defend these suits in the State Court as they were brought, suit by suit, they could interpose in that Court this constitutional provision and say that the ordinance on that account was ineffective and invalid; and if the State Courts overruled them in that respect, take it to the Supreme Court of the State, and if the Supreme Court of the State overruled them in that respect, take it as a Federal question to the Supreme Court of the United States. No doubt remains but what that channel of getting this Federal question before the Supreme Court is open. But from the time that chancery jurisdiction has been created down to the present time there has been a remedy against the evil and burden of such a multiplicity of suits that to allow them all to be brought would, independently of the merits of each one of them—their mere bulk—impose a hardship and wrong upon the defendant; and that remedy has been by a suit in equity to restrain them all individually, determining the whole question in one controversy. That is a case in equity within the meaning of the Constitution of the United States, which confers upon the courts of the United States judicial power

to determine cases arising at law or in equity under the Constitution and laws of the United States; which Constitutional provision has simply been put into execution by the statute which confers upon the. Circuit Courts the jurisdiction to determine cases of that kind.

These complainants, therefore, have a case in equity to restrain the bringing of these suits, because their very multiplicity would be a burden to them; and the only question remains whether that case arises out of the Constitution of the United States. But for these prohibitions in the Constitution there would be no case. Remove those prohibitions in the Constitution and this case would not exist. The case grows out of these prohibitions. The prohibitions are the soil from which the whole tree grows. How can it be said, then, that it is not a case that arises out of the Constitution? It is of no consequence that the Constitution has been so completely and fully interpreted that there is no doubt about the right; that is only saying that because you can see the right clearly, it does not arise from that instrument; that if you did not see the right clearly it would arise from the Constitution. The question as to the source of the right to bring that case—the question as to the fundamental source of the case itself—does not depend upon how plain a case it is, but depends upon what fundamental constitutional or legal principle the party predicates his complaint.

So I think there is no doubt at all of the jurisdiction of this Court in this case. If I had any such doubt I would have to resolve it against the defendants here on the Detroit Railway cases, the Cleveland case and the Vicksburg case. It would be astonishing for a Circuit Court to fly in the face of what the Supreme Court has done in those cases, even though it might disagree with the Supreme Court with respect to the reasoning on which those cases grew.

An order for temporary injunction may be entered, and I suppose will take its course in the way of pleadings.